336 F.3d 924
 Richard ANDERSON; Isaac Oliver; Ted Farrison; O.J. Jenkins; Albert Collins, Plaintiffs-Appellants, and
Quentin Chambers, John Does 1-300, Plaintiffs,
v.
PACIFIC MARITIME ASSOCIATION, Defendant-Appellee, and
Locals 19, 23, 52 International Longshoremen's and Warehousemen's Union, Locals 19, 23, 52 and 98; American President Lines, Ltd.; Eagle Marine Services, Ltd.; Maersk, Inc.; NOL, Inc.; Mitsui OSK Lines (America), Inc.; OOCL (USA), Inc.; Hanjin Shipping Company, LTD.; Sea Star Stevedore, Co.; Marine Terminal Corporation; Kawasaki Kisen Kaisha, Ltd.; Matson Navigation Company; Matson Terminals, Inc.; Jones Stevedoring Company, Local 23, ILWU, Defendants.
 No. 00-35457.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 6, 2001.
 Filed July 17, 2003.
 
 Bradley R. Marshall, Marshall Wheeler Zaug, PLLC, Seattle, WA, for the plaintiffs-appellants.
 Clemens H. Barnes, Perkins Coie, LLP, Seattle, WA, Clifford D. Sethness, Morgan, Lewis & Bockius, LLP, Los Angeles, CA, for the defendant-appellee.
 Appeal from the United States District Court for the Western District of Washington; J. Kelley Arnold, U.S. Magistrate Judge, Presiding. D.C. No. CV-98-05343-JKA.
 Before: REAVLEY,* B. FLETCHER, and TALLMAN, Circuit Judges.
 Opinion by Judge TALLMAN; Dissent by Judge BETTY B. FLETCHER.
 TALLMAN, Circuit Judge.
 
 
 1
 This case presents a cause of action in search of a defendant. The Plaintiffs, a group of longshoremen working on the docks in Seattle and Tacoma, allege that they were subject to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as well Washington's Law Against Discrimination, Wash. Rev.Code § 49.60.[1] But the sole defendant left before us on appeal, Pacific Maritime Association ("PMA"), is not the employer of any of the Plaintiffs. Rather, PMA is a non-profit association of the stevedoring and shipping companies that do employ the Plaintiffs. The district court granted summary judgment to PMA, holding that PMA could not be liable for discrimination because PMA was not the Plaintiffs' employer. We agree and affirm.
 
 
 2
 * A
 
 
 3
 The Plaintiffs are all African American. They allege that they were subjected to a racially hostile work environment while employed on the waterfront in Seattle and Tacoma. For purposes of reviewing a summary judgment order, we assume these facts could be established in favor of the Plaintiffs. Oliver v. Keller, 289 F.3d 623, 626 (9th Cir.2002). Their allegations paint a horrific and pervasive picture of racial animosity and discrimination on the waterfront of the Pacific Northwest.
 
 
 4
 For instance, the Plaintiffs allege that they have been referred to as "nigger," "spook," "nigger gang," "boy," and "son," as well as other racial slurs. They assert that racial innuendos and jokes are common on the docks. Furthermore, they allege that longshoremen training materials employ terms such as "nigger lips" and "nigger heads." The Plaintiffs allege that they were even subject to direct, racially charged physical threats.
 
 
 5
 The members of PMA ("member-employers") are the various companies that employ the longshoremen. The Board of Directors of PMA is primarily composed of executives from these stevedoring companies. The member-employers grant PMA the authority to establish and negotiate labor contracts and policies with the International Longshoremen's and Warehousemen's Union ("Union").
 
 
 6
 PMA, as the bargaining agent for the member-employers, entered into a Collective Bargaining Agreement ("CBA") with the Union, as bargaining agent for its local affiliates. Under the CBA, the member-employers and their walking bosses and foremen—but not PMA—have the responsibility to "supervise, place or discharge men and to direct the work and activities of longshoremen on the job in a safe, efficient and proper manner." The member-employers—but not PMA—also retain the right to discipline any longshoreman for "in-competence, insubordination or failure to perform the work as required in conformance with the provisions of [the CBA]." The CBA lays out an extensive system for maintaining discipline, safety, and conformity with the master labor agreement on the docks, but these provisions place the burden of meeting these standards on the longshoremen, the Union, and the member-employers and their supervisors—not PMA.
 
 
 7
 Specifically, the CBA prohibits illegal discrimination, and provides a detailed procedure for reporting and curing alleged discrimination. Under this procedure, all grievances regarding discrimination must first be referred to a longshoreman's supervisor. If the supervisor cannot settle the grievance, it is referred to one official designated by the Union and one official designated by the member-employers. If the grievance still is not settled, it is referred to a Joint Committee made up of six members. Three members of the Joint Committee are appointed by the Union and three are appointed by the member-employers. If the Joint Committee fails to resolve the dispute, the CBA provides for binding arbitration.
 
 
 8
 Although PMA has the general responsibility for ensuring that member-employers comply with the terms of the CBA, PMA has no direct role in this formal procedure for resolving discrimination complaints. Under the CBA, PMA is not responsible for handling, collecting, or investigating grievances, let alone mediating or resolving the grievances. Those tasks, under the plain terms of the CBA, are left to managers employed by the member-employers and the Joint Committee appointed by the member-employers and the Union.[2]
 
 
 9
 In 1997, the Union and PMA agreed to an expedited grievance procedure to address both discrimination and the problems associated with the length of time needed to complete the formal procedure. This expedited procedure is a supplement to, and not a replacement of, the formal grievance procedure described in the CBA. Under this new expedited procedure, a longshoreman alleging racial or sexual discrimination is required to fill out a form— copies of which are posted around the work site—describing the discrimination. The longshoreman is then required to send a copy of the form to the area manager of PMA and to the president of the local chapter of the Union. Both the PMA area manager and the local-chapter president then have the discretion to call for a meeting or series of meetings in order to mediate the dispute. If this is unsuccessful, the worker can then require that the parties enter into arbitration.
 
 
 10
 PMA also performs a variety of other organizational tasks for its member companies. Together with the Union, it operates a dispatch hall[3] where longshoremen receive their work assignments from the member-employers. It also provides a payroll service for its member-employers. PMA keeps track of where everyone works each day, but the member-employers actually pay the longshoremen.
 
 
 11
 Equally important to our analysis is what PMA does not control. It does not supervise the longshoremen. It has no power to hire or fire longshoremen. It has no power to discipline longshoremen. It does not supervise the work sites of its member-employers. It is undisputed that the monitoring and control over those sites, as well as the control of the employees, is within the sole province of the member-employers.[4]
 
 B
 
 12
 The Plaintiffs filed their original complaint in the United States District Court for the Western District of Washington. It named as defendants the shipping and stevedoring companies that hired the Plaintiffs and for whom the Plaintiffs worked each day, plus four local chapters of the Union, and PMA. The original complaint asserted claims for hostile work environment on the waterfront, disparate impact and treatment, breach of the duty of fair representation against the Union, breach of contract, outrage, and civil RICO violations.
 
 
 13
 For reasons that have never been satisfactorily explained to us by their counsel, the Plaintiffs then filed an amended complaint naming only the Union and PMA as defendants, dropping the shipping and stevedoring companies from the lawsuit. The Plaintiffs subsequently voluntarily dismissed all of their remaining claims against the Union except for a single claim against one of the Union's local chapters. The district court entered summary judgment for the Union on this claim and the Plaintiffs have not appealed that decision. The district court also entered summary judgment for PMA on the Plaintiffs' hostile work environment claim. The court held that even though a genuine issue of material fact existed as to whether the Plaintiffs were subject to a hostile work environment, PMA could not be held liable for that environment. The Plaintiffs' appeal before us concerns only their hostile work environment claim against PMA.
 
 II
 
 14
 We review grants of summary judgment de novo. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998).
 
 
 15
 * Below, the Plaintiffs hinged the viability of their hostile work environment claim against PMA on the applicability of the "integrated enterprise" test. We apply this four-part test to determine if two or more employers are so interrelated that they form an integrated enterprise. See, e.g., Herman v. United Bhd. of Carpenters, 60 F.3d 1375, 1383-84 (9th Cir.1995).
 
 
 16
 The Plaintiffs argued that PMA is an integrated enterprise with its member-employers and therefore liable for the hostile work environment at the member-employers' work sites. The district court, noting the likely inapplicability of the test to this case, nevertheless found that PMA is not an integrated enterprise with its member-employers. Both parties on appeal continued to frame the issue as whether PMA can be liable under the integrated enterprise test.
 
 
 17
 The district court's reluctance was justified. The test does not determine joint liability as the parties suggest, but instead determines whether a defendant can meet the statutory criteria of an "employer" for Title VII applicability.
 
 
 18
 Title VII applies to an employer only if that employer employs 15 or more employees. 42 U.S.C. § 2000e(b); see also Clackamas Gastroenterology Assocs., P.C. v. Wells, ___ U.S. ___, 123 S.Ct. 1673, 1676 n. 1, 155 L.Ed.2d 615 (2003). A plaintiff with an otherwise cognizable Title VII claim against an employer with less than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively this enterprise meets the 15-employee minimum standard. We use the integrated enterprise test to judge the magnitude of interconnectivity for determining statutory coverage. See Kang v. U. Lim. Am., Inc., 296 F.3d 810, 815-16 (9th Cir.2002) (applying the integrated enterprise test "for purposes of Title VII coverage" when the plaintiff's direct employer only had six employees but a related subsidiary had more than 50 employees); Herman, 60 F.3d at 1383 (applying the integrated enterprise test to determine whether the plaintiff's direct employer—who employed only seven employees—could be an employer for purposes of the Age Discrimination in Employment Act when that Act requires 20 employees to meet the definition of employer and when the direct employer was a union that was affiliated with a much larger union, which did meet the minimum employee standard for the Act); Childs v. Local 18, Int'l Bhd. of Elec. Workers, 719 F.2d 1379, 1382 (9th Cir.1983) (applying the integrated enterprise test "for purposes of jurisdiction under Title VII" when the plaintiff's direct employer employed less than 15 employees).
 
 
 19
 Here, PMA does not dispute that it employs at least 15 employees.[5] Because this places PMA within Title VII's statutory coverage as an "employer," the integrated enterprise test is inapplicable.
 
 B
 
 20
 PMA's status as an employer in its own right does not mean that a claim by the Plaintiffs, who were not PMA's employees, is cognizable under Title VII. The dissent argues that a claim against PMA for the hostile work environment occurring on the docks may properly be brought based on the doctrine articulated in Sibley Memorial Hospital v. Wilson, 488 F.2d 1338 (D.C.Cir.1973), and cases which have followed it in our circuit. We disagree.
 
 
 21
 In Sibley, the defendant-hospital ran a nursing office where patients would request the services of a private duty nurse. Id. at 1339. The nursing office would then contact various outside referral sources and request that a private nurse be sent to the hospital to work with the patient. Id. These private nurses were employees of the patient, not the hospital. Id. The plaintiff, a male private nurse, alleged that on at least two occasions supervisory nurses at the hospital rejected him upon arrival because the requesting patients were female and he was male. Id. at 1339-40.
 
 
 22
 The plaintiff sued the hospital under Title VII. Id. at 1340. The hospital moved to dismiss or for summary judgment, arguing that the lack of an employer-employee relationship prevented jurisdictional coverage of the claim under Title VII. Id. The district court denied the hospital's motion and, without affording the hospital a chance to answer on the merits, sua sponte entered summary judgment for the plaintiff. Id. On appeal, the D.C. Circuit noted that one of Title VII's goals was to equalize access to job opportunities. Id. Additionally, Title VII did not explicitly require a direct employer-employee relationship. Id. But that did not mean that no relationship was required for a claim to fall under Title VII. The court stated:
 
 
 23
 We think it significant that [Title VII] has addressed itself directly to the problems of interference with the direct employment relationship by labor unions and employment agencies—institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. On the facts as alleged ... [the hospital] is so circumstanced, and its daily operations are of such a character as to have such a nexus to the third parties in this case....
 
 
 24
 Id. at 1342. Nevertheless, because the hospital had not answered on the merits, the district court's summary judgment in favor of the plaintiff was reversed. Id. at 1344.
 
 
 25
 We first addressed the viability of Sibley indirect-employer liability in Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 (9th Cir.1980). There, we noted that for Title VII to apply, "there must be some connection with an employment relationship," though the "connection ... need not necessarily be direct." Lutcher, 633 F.2d at 883. Citing Sibley, we explained that "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." Lutcher, 633 F.2d at 883 n. 3.
 
 
 26
 Later, in Gomez v. Alexian Brothers Hospital, 698 F.2d 1019 (9th Cir.1983), we applied Sibley with full force. The plaintiff in Gomez was a Hispanic physician working for a corporation named AES. 698 F.2d at 1020. On behalf of AES, the plaintiff submitted a proposal to the defendant-hospital, offering AES's services to operate the hospital's emergency room. Id. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. Id.
 
 
 27
 The plaintiff sued under Title VII. The district court granted summary judgment to the hospital on the grounds that the plaintiff lacked standing under Title VII because under the proposed contract the plaintiff would still have been an employee of AES, not of the hospital, and AES would have been just an independent contractor for the hospital. Id.
 
 
 28
 We reversed. Id. at 1022. We held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between the plaintiff and AES. Id. at 1021. Additionally, we noted the perverse result if an employer in the hospital's position were allowed "to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so" with its own employees. Id. (citation omitted).
 
 
 29
 In Association of Mexican-American Educators v. California, 231 F.3d 572 (9th Cir.2000) (en banc), we explained the rationale behind indirect-employer liability under Title VII. In that case, the plaintiffs were a class of Mexican-American, Asian-American, and African American prospective and current teachers who challenged California's use of a skills test—which was a prerequisite to employment in the state's public schools—under Title VII. Id. at 577. The plaintiffs alleged that the test had a disparate impact on minorities. Id. at 578.
 
 
 30
 We held, relying on Sibley as well as our decisions in Lutcher and Gomez, that Title VII covered the plaintiffs' claims. Ass'n of Mexican-American Educators, 231 F.3d at 580-84. We agreed with the district court that the allegedly racially discriminatory test "interfered" with the plaintiffs' relationship with their future employers— the school districts—because it dictated whom those employers could and could not hire. Id. at 581-82. We emphasized that "[o]ur conclusion is dictated by the peculiar degree of control that [California] exercises over local school districts." Id. at 581.
 
 
 31
 When we apply the principles articulated in these precedents to the case before us, it is clear that PMA cannot be liable to the Plaintiffs under Title VII. All of our cases employing Sibley's rationale— and indeed Sibley itself—have done so in instances where the indirect employer was the entity performing the discriminatory act. In Sibley, it was the hospital which refused to allow the male nurse to see the patient; in Gomez, it was the hospital that refused to hire the company with Hispanic doctors; and in Association of Mexican-American Educators, it was the state that required applicants to take a test with disparate impacts on minorities.
 
 
 32
 Here, on the other hand, the hostile work environment did not occur at any facility controlled by PMA, but instead at the docks and waterfront facilities controlled by the member-employers that actually employ and supervise the Plaintiffs and their putative harassers on the job site.[6]
 
 
 33
 In a circumstance like this, the considerations justifying liability under Title VII no longer apply. Sibley and its progeny extended Title VII coverage to indirect employers when those employers discriminated against and interfered with the employees' relationship with their employers. PMA is not interfering in any sense with the employees' relationship with their employers because it was those employers, not PMA, that allowed the allegedly hostile work environment at the sites controlled by the member-employers.
 
 
 34
 The dissent places much weight on the fact that PMA had some involvement in the grievance procedures. We think this involvement too attenuated to constitute "interference" and thus insufficient to impose liability based on a Sibley analysis. First, PMA had no authority under the formal procedures to correct any harassment at the waterfront. The grievances under the formal procedures were never referred to PMA. Second, even under the expedited procedures, PMA's role was limited to that of a discretionary mediator. It was not empowered to fire or even discipline longshoremen for harassment. It was not empowered to conduct investigations and to implement new work site rules to curb harassment.[7] Third, PMA's authority to act as a mediator is not directly related to the facts of this case. The majority of grievances the Plaintiffs made were filed under the formal procedures, where PMA had no role. And the Plaintiffs have not presented any evidence that a written grievance was made under the expedited procedures that would invoke PMA's discretionary role to conduct meetings in order to attempt to settle the dispute.
 
 
 35
 In light of these facts, we think the imposition of indirect-employer liability under Title VII inappropriate. Sibley and its Ninth Circuit progeny condone liability when there exists discriminatory "interference" by the indirect employer and where the indirect employer had some peculiar control over the employee's relationship with the direct employer. Here, there was no such interference by PMA. It did not cause the hostile work environment. And its power to stop the hostile work environment was so limited that it cannot be said to have "interfered" by failing to take corrective measures to stop the harassment when the power to take those measures belonged to the member-employers.
 
 III
 
 36
 The Plaintiffs may have been the victims of severe racial discrimination and rightly sought to redress their wrongs in federal court. Their employers and the Union were the obvious defendants and were initially named in the Plaintiffs' complaint. The Plaintiffs' decision to drop the employers and the Union as defendants from this case is a mystery to us. All that remains, a cause of action alleging a hostile work environment against PMA, is not cognizable against this defendant under Title VII. PMA was not the one illegally discriminating; PMA did not exercise control over the waterfront work environment the Plaintiffs claim was hostile; and PMA's purported failure to remedy the situation on the docks did not amount to interference with the Plaintiffs' employment relationship with the stevedoring and shipping companies. The district court properly granted summary judgment in favor of PMA.
 
 
 37
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Washington's Law Against Discrimination tracks federal law, and thus our analysis will cite only federal law, but applies with equal force to the Plaintiffs' claim under Washington lawSee, e.g., Payne v. Children's Home Soc'y of Washington, Inc., 77 Wash.App. 507, 892 P.2d 1102, 1105-06 (1995).
 
 
 [2]
 Specifically, the CBA commands the Joint Committee to "investigate and adjudicate all grievances and disputes" and instructs that the Joint Committee—not PMA—has "the power and duty to investigate and adjudicate" any grievance before it. The Joint Committee is independent of PMA and PMA has no role in selecting the members of the Joint Committee or reviewing the Joint Committee's conclusions. In light of these facts and the clear language of the CBA, we think erroneous the dissent's factual conclusion—critical to its analysis—that the member-employers "delegated the responsibility of collecting, investigating, and mediating complaints of workplace discrimination to one, central agent [PMA]."
 
 
 [3]
 Contrary to the implication contained in the dissent, the vast majority of acts constituting the alleged hostile work environment occurred at the docks controlled by the member-employers, not at the hiring hall jointly operated by the Union and PMA. Viewing the facts in the light most favorable to the Plaintiffs, they simply have not alleged that the hiring hall, in and of itself, constituted a hostile work environment
 
 
 [4]
 Our colleague in dissent places much weight on the fact that PMA's bylaws afford PMA the power to discipline member-employers who violate terms of contracts entered into by PMA on behalf of the member-employers. But this discretion retained by PMA cannot be viewed in a vacuum. The contract in question here—the CBA—places the burdens of monitoring, investigating, and resolving grievances squarelyand only on the member-employers and the Union. PMA is not directly involved. Thus, we do not think that the power conferred to PMA in its own bylaws vests PMA with the power to, as the dissent suggests, make wholly independent grievance investigations and fashion appropriate remedies when that is not the procedure the CBA contemplates. Indeed, if the general supervisory power contained in the bylaws acted as the vast bastion of responsibility and liability that the dissent suggests, PMA would be liable for any deviation from the CBA by any of its member-employers if PMA did not suspend or expel the offending member-employer from PMA.
 If this reasoning were adopted it would rob the CBA grievance procedures of any real meaning because, according to the dissent's logic, PMA would always have a duty independent of the CBA to conduct its own investigation and resolution because of its power under PMA bylaws to monitor compliance with the rules and policies established by the CBA. This is not what the CBA and PMA bylaws state, let alone contemplate, and thus we reject this creative judicial attempt—not even presented by the Plaintiffs—to impose blanket responsibility on PMA when in fact no such responsibility exists.
 
 
 [5]
 Because the parties' initial briefs focused exclusively on the applicability of the integrated enterprise test, wesua sponte ordered supplemental briefing on the possible liability of PMA under the theory espoused by our colleague in dissent. In response, PMA conceded that it was an "employer" of its own employees for Title VII purposes, but not of the Plaintiffs or other longshoremen.
 
 
 [6]
 The dissent's characterization of PMA's power of "general supervision on the waterfront" (emphasis added) is unsupported by the record. It is undisputed that, other than at the hiring hall, all other facilities and work sites where racial harassment allegedly took place are controlled and supervised by the member-employers.
 
 
 [7]
 The dissent's statement that PMA not only had the power, but the "duty to receive, investigate, and mediate worker grievances" (emphasis added), is simply wrong under the relevant documents which created the organization and defined its relationship to the employers, the Union, and the longshoremen.
 
 
 
 38
 BETTY B. FLETCHER, Circuit Judge, dissenting.
 
 
 39
 I respectfully dissent. The majority commences with the statement that this is a cause of action in search of a defendant. I accept their assertion that there is a cause of action because I have found the defendant, and it is PMA.
 
 
 40
 The district court found appellants' evidence of harassment sufficient to raise an inference that a hostile work environment existed on the waterfronts of Seattle and Tacoma, Washington, in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq. (1994), and the Washington Law Against Discrimination, Wash. Rev. Code § 49.60 et seq. (2002). However, erroneously relying on the integrated enterprise test, the district court entered summary judgment in favor of the Pacific Maritime Association ("PMA") as to all claims, including hostile work environment. The majority acknowledges the district court's error in relying on the integrated enterprise test but nonetheless affirms summary judgment in favor of PMA finding that the Sibley[1] rule is inapplicable to this case. The majority holding is simply wrong. To highlight the error in the majority's analysis, I must start with a recital of the relevant facts omitted from the majority opinion to give the full flavor of racial discrimination on the waterfront and the role PMA plays. Summary judgment is simply unwarranted.
 
 I.
 
 A. Factual Background
 
 
 41
 The appellants, Richard Anderson, Albert Collins, O.J. Jenkins, Ted Farrison, and Isaac Oliver, African American longshoremen and foremen, work on the waterfronts of Seattle and Tacoma, Washington; they are union members of local affiliates of the International Longshoremen's and Warehousemen's Union ("ILWU"). Because none of them holds a steady position with any of the member companies represented by the PMA, each must report daily to a central hiring hall, jointly maintained and operated by the PMA and the unions, through which each is then dispatched to an area work site. The PMA and the ILWU established the hiring hall system through collective bargaining; because the workload for each of PMA's member companies is sporadic, the hiring hall promotes consistent employment for union workers and ensures that work assignments will be allocated according to the terms of the collective bargaining agreement ("CBA"). The CBA governs the terms and conditions of employment for longshore workers and includes a provision prohibiting race discrimination.[2]
 
 
 42
 The PMA, a nonprofit association of maritime employers and shipping companies, serves, among other roles, as the agent of its member companies in collective bargaining negotiations with the ILWU. The PMA employs a managerial staff, including area manager for the Pacific Northwest, Craig Johnson, and assistant area manager, Joseph Webber, that is responsible for collecting information regarding the day-to-day operation of the docks and for ensuring that the individual companies operate in compliance with the CBA, including the antidiscrimination provision.
 
 
 43
 The member companies select representatives to serve on the PMA Board of Directors ("Board"), and the Board appoints from among its directors the Coast Executive Committee. The Coast Executive Committee resolves major questions of labor policy for the PMA, subject to the Board's approval. PMA's bylaws provide for the creation of the Coast Steering Committee, composed of terminal managers[3] and empowered by the Coast Executive Committee to perform "the day-to-day administration and enforcement of shoreside and offshore collective bargaining agreements," including the antidiscrimination provisions of the CBA. Contrary to the majority's assertion, the Board is authorized to punish and discipline member-employers who are found responsible for harassment by suspending or excluding from membership in the PMA any companies that have violated the terms of the CBA.[4]
 
 
 44
 As noted by the majority, Section 17 of the CBA establishes a grievance and appeal procedure through which longshore workers may pursue discrimination claims. Pursuant to the CBA, the PMA and the ILWU locals are required to form the Joint Labor Relations Committee ("Joint Committee") to investigate and adjudicate labor grievances.[5] Member companies are permitted to discipline workers violating the terms of the CBA by remanding them to the hiring hall. Any worker against whom a claim is pending before the Joint Committee may not be dispatched to a member company until that claim has been resolved.
 
 
 45
 The majority states that "PMA has no direct role" in Section 17 CBA grievance procedures, while recognizing that "PMA has the general responsibility for ensuring that member-employers comply with the terms of the CBA." Despite the majority's assertion that the right to discipline workers belongs to the individual employers, the PMA plays a critical role in ensuring that member companies do not turn a blind eye to harassment through its power to discipline employers who fail to enforce the anti-discrimination provisions of the CBA. Because the PMA, through subcommittees, establishes the policies that determine how the CBA is administered on a day-to-day basis, it is uniquely positioned to discipline or threaten to discipline employers that fail to address incidents of work site discrimination and harassment. The PMA is empowered to exclude companies from membership that violate the terms of the CBA, thereby denying them access to the trained and experienced union labor force. Conversely, the union cannot unilaterally withdraw from its contractual obligations to an employer because of complaints that it receives regarding workplace discrimination.
 
 
 46
 As part of PMA's role in administering the CBA, it serves as a liaison between the union and its member employers in grievance matters where one employee complains about the conduct of another employee. Union officials and dock workers relied upon the PMA to ensure compliance by member companies with the requirements of the CBA and to facilitate the resolution of conflicts that arise between individual workers and between labor and management. For example, Union representative Mason testified that he would respond to a PMA official instead of a foreman regarding allegations of racial discrimination. In addition, the union faces a potential conflict of interest whenever it addresses race and sex-based grievances in which multiple union members require representation as adverse parties in interest. This is especially true where, as in the present case, the president of the union local charged with pursuing the rights of minority foremen is himself alleged to have made numerous racist and threatening comments. As a practical matter, the PMA held itself out as more than the bargaining representative for the employer, serving more broadly as the companies' agent in the resolution of labor-management disputes related to complaints of discrimination.
 
 
 47
 By the PMA's own admission, over twenty race discrimination grievances were filed under procedures established by the CBA from 1997 to January 2000, several of which resulted in disciplinary action against employees found guilty of using racial slurs. Appellants testified that they have personally filed numerous grievances with the Joint Committee, but that the contractual grievance process was slow and, ultimately, failed to resolve their complaints.
 
 
 48
 In 1994, the ILWU recognized the African American Longshore Coalition ("Coalition"), created for the precise purpose of providing assistance to African American longshore workers suffering racial discrimination. The Coalition has filed grievances on behalf of appellants and other black longshore workers with the union and the Joint Committee, alleging various claims of racial discrimination and harassment. Coalition representative Bennie Jeffries has testified not only that the filing of Section 17 grievances has failed to resolve racial discrimination on the waterfront, but that "some of the persons that sat on the grievance committees themselves had used racial slurs or clearly were insensitive to the plight of Blacks." This testimony was corroborated by Gene Heidal, operations manager for one of the member companies in Tacoma, who testified that as a foreman's committee member he heard other committee members using racial slurs. It was also corroborated by transcript testimony from a previous litigation, involving a different group of plaintiffs, in which Robert Frazier, a class A longshoremen and former member of the Joint Committee, testified that in the late-1980s he overheard PMA area manager Johnson telling racial jokes and using racial slurs, at committee meetings.
 
 
 49
 Following a settlement agreement entered in a previous discrimination lawsuit,[6] the PMA and the ILWU established the expedited procedure for processing race and sex-based discrimination complaints and instituted "sensitivity" training.[7] The PMA occupies a pivotal position in this process; within ten days of any incident, the aggrieved party must complete a written form and deliver a copy to the PMA area manager. The PMA area manager then has the authority to convene all parties to the dispute and to act as mediator.
 
 
 B. Allegations of racial harassment
 
 
 50
 Appellants' allegations of racial harassment include the use of racial slurs on an almost daily basis at the docks. For example, some of the instrumentalities of longshore work as well as certain types of work were commonly referred to as "nigger-rigging," "nigger-heads," "nigger-lips," and "nigger work." Some of these terms were included in operating manuals published by the PMA. Several appellants testified that racist graffiti littered the walls of restrooms on almost every pier along the Seattle-Tacoma waterfront and that some of this graffiti was threatening in nature.[8] This testimony was corroborated by operations manager Heidal who admitted to having seen "numerous" examples of racist graffiti. Heidal testified that the sensitivity training he received from the PMA did not require that he report the graffiti to an official of PMA or that he take steps to remove it.
 
 
 51
 As a foreman whose work assignments required him to alternate work sites and employers, appellant Oliver intercepted radio communications between his supervisees referring to him as "that nigger from Seattle" and his employers' supervisors frequently referred to him as "boy."[9] On one occasion, he was even asked by a coworker if he had a tail.
 
 
 52
 Appellant Collins testified that he overheard conversations between dock workers in which they remarked that "niggers" were complaining about everything. Collins was told personally by former president of Local 98,[10] Don Miniken, that "niggers" wanted everything, including to work at all the docks. Miniken also stated that he would not put any "nigger" on the payroll. Following the murder of an Ethiopian man by racist skinheads in Oregon, appellant Jenkins overheard Miniken to have said, "That's good. I like to see that. We need to teach these niggers a lesson."
 
 
 53
 Appellants testified that their supervisory authority as foremen was frequently undermined by both the employers and the unions, as well as by their subordinates. To that effect, appellant Oliver testified that when he was placed on a list of foremen to receive supercargo training, derogatory cartoons were placed on his desk. Appellant Jenkins testified that, when he fired white employees, both the employers and the unions interceded to have them reinstated without inquiring into Jenkins' reasons for their discharge. He maintained that no similar resistance was given to the firing of black longshoremen.
 
 
 54
 Finally, appellants' allegations of harassment include threats of violence made by coworkers. Dockworkers routinely use radios to communicate at maritime work sites. After appellants filed suit, appellant Farrison overheard another worker say over one of the channels, "We should get together tonight and kill us a couple of these niggers and maybe they won't be wanting to sue us." Appellant longshoreman Anderson testified that, while he was still a casual in 1995, he found himself in an altercation with another, white casual after the latter referred to his Ghanaian wife as a "black jungle bunny bitch." This altercation took place in the hiring hall, within earshot of the dispatchers who were on duty there. Immediately thereafter, Anderson confronted the alleged harasser outside the hiring hall, where the latter brandished a nine-millimeter pistol and threatened him with it. Anderson testified that he reported this incident to union representatives, but that no response was taken. On another occasion, Anderson brought his minor son to the hiring hall, was verbally harassed by a dispatcher as a result and ordered not to bring his son to the hall again, even though white dockworkers frequently brought their children to the hall without reprimand.
 
 
 55
 The PMA denies that appellants ever informed PMA officials directly of any of the alleged incidents of harassment forming the basis of their lawsuit. However, appellants have provided ample testimony in the record to rebut such allegations. First, they presented written and oral reports of numerous incidents of racial discrimination and harassment to both union and employer representatives; second, they reported grievances to PMA officials directly. Most notably, appellants Jenkins and Oliver testified that they spoke with PMA area manager Johnson regarding the pervasiveness of racist graffiti and racial slurs at the terminals and Miniken's statements following the Oregon hate crime.
 
 
 56
 Johnson, the PMA area manager, testified during his deposition that "numerous individuals" had come to his office "numerous times" to complain about racial discrimination and harassment at the Seattle and Tacoma ports. Johnson specifically included appellants Jenkins and Farrison as among the persons who made verbal complaints to him. Johnson recalled that at least a few of those complaints were made since 1997, when the expedited grievance procedure was put in place. He recalled that through those procedures and other lawsuits he became aware of the use of racial slurs on the waterfront. However, Johnson did not keep notes or written records of any kind regarding complaints that were brought to him personally. He testified that, hypothetically, if he were confronted with complaints of racial harassment by African-American foremen, he would direct such persons to the contractual grievance process and he would attempt to speak directly with the accused parties. However, he could not recall a single occasion when he had done either in response to a complaint of harassment made directly to him. Contrary to the representations of the expedited grievance procedure made by Miniace and Mason, Johnson denied that there was any established procedure for how he ought to deal with such complaints. In fact, in his deposition testimony, Johnson suggested that he had no obligation to pursue these complaints.
 
 
 57
 Contrary to the majority's assertion, PMA plays an active role in both the formal and informal grievance procedures. PMA administers the CBA on a daily basis. As part of this administration, it has the authority to convene parties and mediate disputes involving racial discrimination allegations such as the ones raised by appellants to Johnson. Moreover, the PMA has the authority to remove member organizations that fail to take actions to reprimand employees involved in discriminatory acts. If the PMA fails to investigate grievances or alert member companies, then alleged perpetrators have no incentive to stop harassing their victims. Moreover, the PMA establishes labor policy affecting the entire waterfront and has the ability to take measures to curb discriminatory acts such as the racist graffiti, as well as incidents at the hiring hall.
 
 II.
 
 58
 The district court initially denied defendant's motion for summary judgment on appellants' hostile work environment claims, finding that genuine questions of fact remained concerning whether the alleged harassing conduct and racist graffiti were "`sufficiently severe or pervasive to alter the conditions of the victim[s'] employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). However, the magistrate judge ultimately decided, despite this ruling, that the PMA is not the proper defendant to hold liable for a hostile work environment on the waterfront. The magistrate judge first considered whether the PMA forms an "integrated enterprise" with its member companies, apparently presuming that, if an integrated enterprise were to exist, then the PMA would be vicariously liable for the discriminatory conduct of its member companies. The magistrate judge concluded that the PMA and its members did not form a single, integrated enterprise and further surmised that, even if they had, the PMA could not face hostile work environment liability, because appellants failed to show that it "controll[ed] the day-to-day working environment encountered by the longshore workers."
 
 
 59
 We requested supplemental briefing as to the applicability of Sibley Mem'l Hosp. v. Wilson, 488 F.2d 1338; 1341 (D.C.Cir. 1973), and its progeny. I agree with the majority's conclusion that the district court erred in applying the integrated enterprise test to find that PMA is not a proper defendant. That issue is behind us. However, I disagree with the majority's finding that Title VII is inapplicable to PMA's role here. Under our circuit's precedent, the PMA may be liable under Title VII for failure to take action and to respond to complaints and harassment, failure to discipline member companies and their employees, and for the conduct of its own employees because of (1) its general supervision of the waterfront, (2) its direct control over the hiring hall, (3) its involvement in racial grievance procedures, and (4) its capacity to discipline members who violate the anti-discrimination policies of the CBA.
 
 
 60
 As the majority acknowledges, the PMA does not dispute its eligibility for statutory coverage as an employer under Title VII, 42 U.S.C. § 2000e(n); rather, it disputes whether it is the proper entity to be held liable for acts of hostile work environment harassment occurring on the waterfront where its member companies conduct business. We have concluded from the diversity of entities covered by the statute "that Congress intended to close any loopholes in Title VII's coverage and to extend the statute's coverage to entities with actual `[c]ontrol over access to the job market,' whether or not they are direct employers." Ass'n of Mex.-Am. Educators v. State of California, 231 F.3d 572, 581 (9th Cir. 2000) (en banc) (quoting Sibley Mem'l Hosp. v. Wilson, 488 F.2d 1338, 1341 (D.C.Cir.1973)). The statute's coverage of employers and their agents should be interpreted in terms of this overarching purpose. See Trevino v. Celanese Corp., 701 F.2d 397, 403 (5th Cir.1983) (stating that "[t]he term `employer' as used in Title VII... was meant to be liberally construed"). Though we require "`some connection with an employment relationship for Title VII protections to apply,' "that connection" "`need not necessarily be direct.'"" Ass'n of Mex.-Am. Educators, 231 F.3d at 580 (quoting Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 (9th Cir.1980)).
 
 
 61
 Our circuit follows the rationale of the D.C. Circuit in Sibley Mem'l Hosp. v. Wilson, 488 F.2d 1338 (D.C.Cir.1973), with respect to indirect employer liability under Title VII. The D.C. Circuit held that the hospital could be held liable under Title VII for sex discrimination, even though it was not the plaintiff's direct employer, because it interfered on invidious grounds with his ability to form third-party employment relationships. Id. at 1342. The court noted that Title VII extends its protection from "unlawful employment practices" to "any individual" and not "only an employee of an employer."[11] Id. (citing 42 U.S.C. § 2000e-2(a)(1)). The court concluded that the hospital maintained control over the plaintiff's access to private patients and control over the premises on which he provided his services, thereby forming "a highly visible nexus" between the hospital's services and "the creation and continuance of direct employment relationships between third parties." Id. at 1342. The hospital's exercise of its control over these opportunities exposed it to Title VII liability.
 
 
 62
 We have adopted a broad interpretation of Sibley, with the caveat that "there must be some connection with an employment relationship for Title VII protections to apply." Lutcher, 633 F.2d at 883; see also Bender, 159 F.3d at 189 (adopting the Ninth Circuit's modification of Sibley). In Gomez v. Alexian Bros. Hosp., 698 F.2d 1019 (9th Cir.1983) (per curiam), we applied the modified Sibley rule to the case of an Hispanic medical practitioner who asserted claims of national origin discrimination against the defendant hospital and its president arising out of his attempt to secure a contract on behalf of his employer, American Emergency Services Professional Corporation Medical Group ("AES"), to operate the hospital's emergency room. Id. at 1020. We found that the plaintiff had provided sufficient evidence that "defendants' discrimination against him based on his national origin denied him the opportunity to be employed by AES as director of defendants' emergency room." Id. at 1021. Although Gomez continued to work for AES after the incident, we concluded that "[t]he conditions of plaintiff's employment are different than they would have been had he not been discriminated against." Id. Thus, our decision in Gomez extended Sibley beyond cases where an employer fails to refer the plaintiff for an employment opportunity with a third party, to include any interference with the terms and conditions of an individual's employment whether or not resulting in a complete loss of employment.
 
 
 63
 Most recently, we have applied the Sibley rule to a class-action lawsuit brought by minority educators against the State of California. In Association of Mexican-American Educators v. State of California, we held that the state could be held liable for "requiring, implementing, and administering" a qualifying examination for teacher certification that had a discriminatory impact on minority applicant teachers. 231 F.3d at 581. We held that the state could assume liability for the adverse impact caused by the test, even though the minority plaintiffs' prospective employer was not the state but individual local school districts. We based our conclusion on the state's "peculiar degree of control... over the local school districts," due to the California legislature's plenary authority to regulate public education and the state government's funding obligations to local public schools, which affect their "day-to-day" operations. Id. By requiring the challenged test, the state had "created a limited list of candidates from which local public school districts may hire," thereby influencing the employment policies and practices of its local school districts. Id. at 582.
 
 
 64
 Our broad application of Sibley demonstrates that indirect employer liability may attach when an employer's interference with the plaintiff's third-party employment relationship adversely affects the terms and conditions of the plaintiff's employment, and not just in cases where the employer discriminatorily refuses to refer the plaintiff for a job. The question central to this line of cases, and which must be answered in this case, is whether PMA committed any acts or failed to commit any acts, peculiar to its control over the waterfront and its relations with member companies and their employees, that adversely interfered with the terms and conditions of the appellants' employment with the member companies. Viewed in the light most favorable to appellants, I conclude that a genuine issue of material fact exists that defeats summary judgment.
 
 
 65
 The magistrate judge's reliance upon the integrated enterprise test led it to ignore evidence in the record of PMA's role and conduct that may expose it to Title VII liability. There is no doubt that the PMA exercises special control over employment conditions and opportunities with its member companies. Dockworkers depend upon the PMA for the receipt of their paychecks, for the administration of the hiring-hall dispatch system through which they receive their work assignments, for the labor policies that bind all member employers, and for the administration of the expedited grievance procedure available for complaints of discrimination. The magistrate judge considered only whether the PMA could be held liable for the conduct of its members, in which it was not directly implicated. The magistrate judge did not consider (1) what conduct by PMA officials might subject it to liability or (2) whether it should be held liable for harassing conduct committed by its member companies or their employees in any area over which PMA exercises control. Appellants allege inter alia that PMA officials, charged with the crucial responsibility of investigating and mediating discrimination complaints, failed to process numerous complaints of racial discrimination and hostile work environment harassment; that a hostile work environment persisted on the waterfront despite these complaints; that the PMA continued to retain companies within its membership against which complaints had been lodged and to refer appellants to job assignments with those companies; that the PMA failed to exercise its authority to set labor policy on the waterfront in order to curb the harassment; that harassing conduct also occurred in the hiring hall operated by the PMA; and that PMA and union officials charged with the responsibility of prosecuting and mediating discrimination grievances themselves were motivated by racial animus. Appellants argue that the PMA should be held liable for the hostile work environment on the waterfronts of Seattle and Tacoma. Appellants do not confine their allegations of a hostile work environment to any specific terminal site or group of sites managed by a particular company or group of companies. Rather, appellants depict a pattern of intimidation and harassment pervading the entire waterfront work area, including the hiring hall.
 
 
 66
 The Supreme Court has "repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to `economic' or `tangible' discrimination and that it covers more than `terms' and `conditions' in the narrow contractual sense." Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation marks and citations omitted). Rather, the Court has stated that "[t]he phrase `terms, conditions, or privileges of employment' [as used in 42 U.S.C. § 2000e-2(a)(1)] evinces a congressional intent `to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[12] Harris, 510 U.S. at 21, 114 S.Ct. 367 (internal quotation marks and citations omitted).
 
 
 67
 Because the Supreme Court has held that hostile work environment harassment affects the terms and conditions of an individual's employment, interference by an indirect employer that causes an individual's employment opportunities to be tainted by a hostile work environment will expose the employer to liability under the Sibley rule. This conclusion is consistent with our hostile work environment precedent generally. First, our precedent does not require that the accused harasser be an employee of the defendant. To the contrary, we have held that "employers are liable for harassing conduct by non-employees `where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct.'" Little v. Windermere Relocation, Inc., 301 F.3d 958, 968 (9th Cir.2002) (quoting Folkerson v. Circus Circus Enters., Inc., 107 F.3d 754, 756 (9th Cir. 1997)); see, e.g., id. (holding that an employer may be liable for hostile work environment harassment when an employee is raped by a corporate client while on a business dinner outing); see also Trent v. Valley Elec. Ass'n, 41 F.3d 524, 526-527 (9th Cir.1994) (reversing summary judgment denying plaintiff's retaliation claim based on defendant's discharge of plaintiff for reporting harassing conduct by nonemployee trainer hired to train defendant's employees). It is equally clear that an employer can be liable for harassing conduct by its own employees perpetrated against an employee of another company who is assigned to work on the defendant's premises. See, e.g., Diana v. Schlosser, 20 F.Supp.2d 348, 352-53 (D.Conn.1998) (holding defendant radio station potentially liable for hostile work environment harassment of plaintiff employee of third-party on-air traffic-report provider based on conduct by station's on-air talent and that defendant radio station "substantially controlled" her employment opportunities with her employer); Moland v. Bil-Mar Foods, 994 F.Supp. 1061, 1074-75 (N.D.Iowa 1998) (holding that non-employer defendant processing plant could face liability for a hostile work environment affecting the former employee of trucking company who was harassed while assigned to work temporarily at the plant); King v. Chrysler Corp., 812 F.Supp. 151, 153-54 (E.D.Mo.1993) (denying summary judgment for defendant car manufacturer on plaintiff's hostile work environment claim, even though plaintiff merely worked in a cafeteria on defendant's business premises and defendant was not her direct employer).
 
 
 68
 Second, we describe Title VII liability as "direct, not derivative," Swenson v. Potter, 271 F.3d 1184, 1191 (9th Cir.2001), meaning that "[a]n employer is responsible for its own actions or omissions" and not vicariously liable for the conduct of others, id. at 1191-92. When no concrete employment action has been taken, we determine whether an employer can be held liable for workplace harassment by evaluating the promptness and the adequacy of the employer's attempts to remedy the harassment. See Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 875-76 (9th Cir.2001); Fuller v. City of Oakland, 47 F.3d 1522, 1528 (9th Cir.1995); Ellison v. Brady, 924 F.2d 872, 882 (9th Cir.1991). To that end, we have held that, "[i]f the employer fails to take corrective action after learning of an employee's ... harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have `adopt[ed] the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy.'" Swenson, 271 F.3d at 1192 (quoting Faragher, 524 U.S. at 789, 118 S.Ct. 2275). Where, as in the present case, a group of employers have delegated the responsibility of collecting, investigating, and mediating complaints of workplace discrimination to one, central agent, that agent cannot then disavow this obligation and refuse to investigate employee complaints without incurring liability for the harassment that persists as a result of its failure to take prompt and appropriate action. Moreover, where harassment occurs in the hiring hall, over which the PMA has direct control, the PMA cannot assert that it lacks authority to take appropriate action.[13]
 
 
 69
 The Supreme Court's treatment of similar issues in the area of union liability is instructive. In Goodman v. Lukens Steel Co., 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), the Court upheld the judgment of the district court, following a bench trial, that the plaintiffs' unions had discriminated against them because of race through their deliberate choice not to prosecute grievances of racial discrimination on behalf of black employees and their tacit encouragement of racial harassment in the workplace.[14] The Court's ruling did not turn upon a finding by the district court that racial animus had motivated the unions' conduct. Rather, the Court held that the unions were liable for their intentional discrimination "against blacks seeking a remedy for disparate treatment based on their race." Id. at 669, 107 S.Ct. 2617. The unions had argued they lacked the intent to discriminate because their refusal to file discrimination grievances was calculated to avoid making the employer defensive during labor negotiations in which the union sought other benefits for its members. Id. at 668. The Court rejected this argument, reasoning that the unions' categorical refusal "to file any and all grievances filed by a black person" could not be excused by its potentially contravening duties to its membership. Id. at 669.
 
 
 70
 Following the Supreme Court's rationale in Goodman, the PMA may be liable under Title VII if it declines to file and investigate discrimination claims brought by African-American dockworkers "because of race." If the PMA declined to pursue these claims because of the complainants' race or because the complaints involved claims of racial discrimination which the PMA found divisive and potentially damaging to its membership, then it may be held liable for disparate treatment. An employer's association, delegated the responsibility of investigating employee discrimination grievances, which refuses to process racial grievances because of race is no different in this sense from a hospital that refuses to refer private nurses to hospital patients because of sex.
 
 
 71
 Our decision should be driven not only by evidence of the PMA's responsibility for past conduct but also by the fact that it is a necessary party to any effective future remedy. The PMA, through the myriad services that it provides to its membership, forms a "highly visible nexus with the creation and continuance of direct employment relationships" between the membership and its labor force. Sibley, 488 F.2d at 1342. Dockworkers, such as appellants, who are not permanently employed by a particular employer are likely to have more regular interaction with the PMA as their surrogate employer than they have with any particular member company.
 
 III.
 
 72
 Appellants have raised genuine issues of fact regarding whether the PMA had assumed the responsibility of receiving, investigating, and mediating discrimination complaints on behalf of the member companies and whether PMA officials refused to investigate such complaints or to pursue them seriously. Dockworkers were told to bring their complaints to PMA officials because the normal grievance procedure established for dockworkers to bring complaints through their union representatives to the Joint Committee was exceedingly time-consuming and had been proved ineffective insofar as complaints of discrimination were concerned. Although dockworkers were technically employees of the member companies, the period in which a dockworker would serve as an employee of any particular company was brief and unpredictable, changing potentially on a day-to-day basis. If hostile work conditions existed at numerous sites simultaneously, in part because all employers were sharing workers who were guilty of engaging in harassing conduct and in part because at least some employers were remiss in their handling of the problem, should appellants have been required to complain to each employer whenever they happened to be assigned to its workforce? The expedited procedure did not require this, and, indeed, it appears ridiculous under the circumstances to suggest that workers should have grieved in this way.
 
 
 73
 The fact that the PMA does not have the authority to discharge employees who have committed harassment does not absolve the PMA of liability.[15] Through its supervisory powers, the PMA was charged with ensuring that its member companies complied with the CBA, which included ensuring that employers do not discriminate on the basis of race. We have stated that "[t]he most significant immediate measure an employer can take in response to a ... harassment complaint is to launch a prompt investigation to determine whether the complaint is justified," and that such an investigation "can itself be a powerful factor in deterring future harassment." Swenson, 271 F.3d at 1193. The PMA was capable of taking prompt and effective remedial action on complaints of racial harassment on the waterfront without itself removing individual harassers. The PMA following an investigation could recommend such a course of action to an employer, just as it could mediate disputes between dockworkers to bring about remedial accommodations in employee work schedules or exercise its ultimate authority to exclude companies from its membership that fail to comply with the antidiscrimination provisions of the CBA.
 
 
 74
 The PMA exposes itself to Title VII liability if it fails or refuses to investigate and process complaints of racial harassment by its members or their employees. Sibley counsels that because "control over access to the job market may reside ... in a labor organization, an employment agency, or an employer ... Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him." Sibley, 488 F.2d at 1341. In the current action, the PMA has a duty to receive, investigate, and mediate worker grievances as part of a special grievance procedure in which all member companies participate. Having accepted this responsibility, it makes no difference whether the PMA is classified as an employer, an agent of an employer, or as a collective bargaining representative with certain duties analogous to those of a union. As the Supreme Court has stated, "a collective-bargaining agent cannot, without violating Title VII ... follow a policy of refusing to file grievable racial discrimination claims however strong they might be and however sure the agent was that the employer was discriminating against blacks." Goodman, 482 U.S. at 668-69, 107 S.Ct. 2617.
 
 
 75
 PMA, as the moving party, did not meet its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. On the contrary, the appellants have established that there are genuine issues of material fact. There is no dispute that a hostile work environment and rampant harassment of blacks exist on the waterfront. The issue is whether PMA can be held responsible under Title VII under the authority of the Sibley doctrine. Did it commit or fail to commit acts in its role as manager of the waterfront (dispatch of longshoremen, enforcement of the CBA against member employers, participation in grievance procedures, waterfront management) that could subject it to Title VII liability? I conclude that there is more than ample evidence submitted by appellants to require remand for trial.
 
 
 
 Notes:
 
 
 [1]
 Sibley Mem'l Hosp. v. Wilson, 488 F.2d 1338 (D.C.Cir.1973).
 
 
 [2]
 Section 13 of the CBA provides that "in accordance with the provisions of Title VII of the 1964 Civil Rights Act, the Employers and the Union are forbidden to discriminate because of race, religion, age, sex or national origin and that the parties are also forbidden to limit, segregate or classify employees in any way that would tend to discriminate."
 
 
 [3]
 The Coast Steering Committee is composed of representatives of the American flag operator group, the foreign line operator group, and the stevedore and terminal group
 
 
 [4]
 Article XI, Section 5 of the PMA bylaws provides in relevant part:
 If any member shall violate, directly or indirectly, any rule or policy established by this corporation, or procure, encourage or assist in any such violation by any other person, whether a member of this corporation or not, or shall, directly or indirectly, violate any provision of any contract or agreement made by the corporation on its behalf with any longshoremen or other employees ashore or unions thereof, or with any seamen or unions thereof, or procure or encourage or assist in any such violation by any other person ... the Board of Directors shall have the power, in its discretion, to suspend any such member for such period of time as the Board of Directors shall prescribe or to expel such member from membership in this corporation.
 (emphasis added).
 
 
 [5]
 The majority's analysis fails to acknowledge that the PMA plays a key role in the grievance procedures set forth in the CBA. Section 17 of the CBA provides that the "[t]heparties shall establish and maintain ... a Joint Labor Relations Committee for each port or area affected by this Agreement." (emphasis added). The parties to the contract include various locals of the ILWU and the PMA. Although the parties dispute whether the PMA is individually represented on the Joint Committee, it is undisputed that individual member companies are not individually represented. Rather, the CBA provides for the employers' interests to be represented collectively by a select group of representatives.
 
 
 [6]
 The facts of this lawsuit were not made a part of the record in this case
 
 
 [7]
 PMA's President and CEO Miniace also testified that the PMA exercised substantial input in the establishment of internal grievance procedures by the member companies
 
 
 [8]
 Appellants in their deposition testimony provided examples such as "We need to kill all niggers," "We need tonight to kill a couple of these niggers so they will understand that this is a might—white man's world," "All niggers should be shipped back to Africa in wooden boxes," and "The only good nigger's a dead nigger."
 
 
 [9]
 Oliver is not the only appellant who testified to being called "boy."
 
 
 [10]
 Local 98 is the foremen's union to which several of the appellants belong
 
 
 [11]
 Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to dischargeany individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). The D.C. Circuit found no good reason "to confine the meaning of `any individual' to include only former employees and applicants for employment, in addition to present employees." Sibley, 488 F.2d at 1341. The statute separately provides that an employer may not "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2) (emphasis added). Since Congress has shown the ability to specify its meaning by adopting specific language, there is no good reason to confine its meaning where it otherwise adopts broad language.
 
 
 [12]
 "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 2074 n. 10, 153 L.Ed.2d 106 (2002).
 
 
 [13]
 The majority opinion acknowledges that incidents of harassment occurred in areas controlled by the PMA, but finds that hiring hall incidents are not sufficient to constitute hostile work environment. Even with the narrow view that the PMA would be liable only for events that occurred at the hiring hall, the majority fails to consider appellants' contentions that they were discriminated against through the dispatch procedure administered by the PMA at the hiring hall
 
 
 [14]
 Title VII provides that a union may not "discriminate against any individual because of race," 42 U.S.C. § 2000e-2(c)(1), or "cause or attempt to cause an employer to discriminate," 42 U.S.C. § 2000e-2(c)(3)
 
 
 [15]
 As discussed above, the PMA did have the authority to exclude member companies from the CBA based on their violation of the terms of the CBA or their violation of any policy set by the association