351 F.3d 1270
 EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
PACIFIC MARITIME ASSOCIATION, Defendant-Appellant, and
International Longshore Workers Union, Local #8, Defendant,
v.
Teresa Jones, Plaintiff-Intervenor-Appellee.
 No. 02-35536.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted September 8, 2003.
 Filed November 24, 2003.
 
 Bradley F. Tellam, Barran Liebman LLP, Portland, Oregon, OR, for the defendant-appellant.
 Thane W. Tienson, Landye Bennett Blumstein LLP, Portland, Oregon, OR, for the plaintiff-intervenor-appellee.
 Appeal from the United States District Court for the District of Oregon, Helen J. Frye, Presiding. D.C. No. CV-99-00536-FR.
 Before: Ruggero J. ALDISERT,* Susan P. GRABER and Ronald M. GOULD, Circuit Judges.
 OPINION
 ALDISERT, Circuit Judge:
 
 
 1
 Pacific Maritime Association (PMA) appeals the district court's denial of a renewed motion for judgment as a matter of law following a jury verdict and judgment in favor of a longshore worker claiming sexual harassment. The district court entered the judgment in favor of intervenor Teresa Jones in an action brought on her behalf by the United States Equal Employment Opportunity Commission (EEOC) against PMA, Marine Terminals Corporation (MTC) and the International Longshore Workers Union Local 8.
 
 
 2
 In its brief, PMA raises seven discrete issues. Because we conclude that PMA was not the employer of Jones for purposes of the sexual harassment claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., we need not address the other issues raised by PMA.[1] Indeed, in light of the presentations at oral argument, our task here appears to track the narrow compass of deciding only whether PMA was a joint employer with MTC for purposes of Title VII. We are persuaded that our decision in Anderson v. Pacific Maritime Association, 336 F.3d 924 (9th Cir.2003), filed after the district court made its rulings in this case, controls the outcome of this appeal. We will reverse.
 
 I.
 
 3
 The United States District Court for the District of Oregon had jurisdiction in the underlying action pursuant to 28 U.S.C. § 1331 based on Jones's claims under 42 U.S.C. § 2000e-2. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 4
 We review de novo the district court's denial of PMA's Rule 50 motions for judgment as a matter of law. Monroe v. City of Phoenix, Ariz., 248 F.3d 851, 861 (9th Cir.2001). In considering a motion under Rule 50 of the Federal Rules of Civil Procedure, we view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Id.
 
 II.
 
 5
 Teresa Jones began working as a "casual" employee in the Portland, Oregon longshore industry in 1980. As a casual employee, Jones reported to a dispatch hall on weekends and evenings to see if any work remained after the registered longshore workers had received assignments. The dispatch hall is operated jointly by PMA, an association of shipping, stevedoring and terminal companies along the Pacific Coast, and by the International Longshore and Warehouse Union (ILWU). Jones worked as a casual employee for several months before she was allowed to register as a "Class B" longshore worker. She remained a Class B worker for nearly a decade, and her duties included cleaning storage areas, driving vehicles and loading and unloading ships.
 
 
 6
 In 1989, Jones became a "Class A" registered longshore worker and was allowed full benefits of membership in the ILWU, Portland Local 8. As a Class A worker, Jones continued to receive assignments from the PMA's dispatch hall to work for the various companies operating on the docks.
 
 
 7
 In October 1996, MTC hired Jones as a "steady sweeper" to empty garbage, sweep, mop and clean restrooms, the kitchen and a location called the gear locker in Terminal 6. As a steady sweeper for MTC, Jones no longer received assignments from the dispatch hall to work for other stevedoring companies. Unlike other longshore workers, workers in the "steady" category effectively work permanently for a single company.
 
 
 8
 In January 1998, after a continuing series of events that Jones described as harassment and threats by co-workers,[2] Jones suffered migraine headaches and heart palpitations that compelled her to leave her position as a steady sweeper at MTC. Jones returned briefly to the waterfront in October 1998, but she was injured on the job shortly thereafter and elected to take early retirement.
 
 
 9
 On April 19, 1999, the EEOC filed a complaint on behalf of Jones against PMA, MTC and ILWU Local 8. After Jones was permitted to intervene, she reached a settlement with MTC and her claims against ILWU Local 8 were dismissed on summary judgment. Jones went to trial against PMA only on her claims that she was subjected to a sexually hostile work environment and that she was retaliated against for having complained of sexual harassment in violation of Title VII. On January 31, 2002, the district court entered judgment in favor of Jones and against PMA in the amount of $264,000 in lost wages and $300,000 in compensatory damages. The district court denied PMA's motions for judgment as a matter of law and for a new trial. PMA timely appealed.
 
 III.
 
 10
 PMA is an employer subject to Title VII. 42 U.S.C. § 2000e(b) (defining an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person,..."). PMA, however, cannot be liable to Jones unless there is "some connection with an employment relationship." Anderson, 336 F.3d at 930 (internal quotation and citation omitted).
 
 
 11
 Jones contends that there was a legally sufficient basis for the jury to find that she had an employment relationship with PMA based on any one of three theories. First, Jones asserts that PMA and MTC were part of an "integrated enterprise." Second, Jones argues that she was an "aggrieved person" whose employment with MTC was interfered with by PMA, thus making PMA her "indirect" employer. Third, Jones contends that PMA was her joint employer along with MTC. Jones's first two contentions are foreclosed by Anderson. Her third contention requires a closer analysis but also ultimately fails.
 
 
 12
 In Anderson, we considered the Title VII liability of PMA for alleged racial discrimination against longshore workers on the docks in Seattle and Tacoma. We also examined much of the same evidence before the district court in this case regarding the relationship among PMA, the stevedoring companies on the waterfront, the unions and individual longshore workers. Id. at 926-927. We need not repeat that material here. We acknowledged that PMA performs organizational tasks on behalf of its members, negotiates a collective bargaining agreement, operates a dispatch hall jointly with the union and provides payroll service for member companies. Id. We also noted what PMA does not do:
 
 
 13
 It does not supervise the longshoremen. It has no power to hire or fire longshoremen. It has no power to discipline longshoremen. It does not supervise the work sites of its member-employers. It is undisputed that the monitoring and control over those sites, as well as the control of the employees, is within the sole province of the member-employers.
 
 
 14
 Id. at 927 (emphasis in original) (footnote omitted).
 
 
 15
 With regard to Jones's first contention, we held in Anderson that the integrated enterprise "test does not determine joint liability as the parties suggest, but instead determines whether a defendant can meet the statutory criteria of an `employer' for Title VII applicability." Id. at 928 (emphasis in original). As in Anderson, there is no question here that PMA employs at least 15 employees and is thus subject to Title VII. See id. at 928-929; 42 U.S.C. § 2000e(b). As in Anderson, however, "PMA's status as an employer in its own right does not mean that a claim by the Plaintiff[ ], who [was] not PMA's employee[ ], is cognizable under Title VII." Anderson, 336 F.3d at 929.
 
 
 16
 Jones's contention that PMA interfered with her employment relationship with MTC and is thus liable as an indirect employer also fails in light of Anderson. In that case, we reviewed at length our prior decisions applying the doctrine of Sibley Memorial Hospital v. Wilson, 488 F.2d 1338 (D.C.Cir.1973). See Ass'n of Mexican-Am. Educators v. Cal., 231 F.3d 572 (9th Cir.2000) (en banc); Gomez v. Alexian Bros. Hosp., 698 F.2d 1019 (9th Cir.1983) (per curiam); Lutcher v. Musicians Union Local 47, 633 F.2d 880 (9th Cir.1980). We concluded that PMA could not be liable for racially discriminatory conduct because "the hostile work environment did not occur at any facility controlled by PMA, but instead at the docks and waterfront facilities controlled by the member-employers that actually employ and supervise the Plaintiffs and their putative harassers on the job site." Anderson, 336 F.3d at 931 (footnote omitted).
 
 
 17
 Liability as an indirect employer requires that the employer have "some peculiar control over the employee's relationship with the direct employer" and that the indirect employer engage in "discriminatory `interference.'" Id. at 932. Because PMA was not "the entity performing the discriminatory act[,]" id. at 931, against Jones, PMA cannot be liable as an indirect employer. As in Anderson, the discriminatory conduct in the instant case took place not at facilities controlled by PMA but rather at facilities controlled by MTC, which actually employed and supervised Jones and the male co-workers who harassed her. Accordingly, "the considerations justifying liability under Title VII no longer apply." Id. PMA's involvement in the grievance procedure does not change this conclusion. See id.
 
 
 18
 We turn now to the principal contention addressed at oral argument — that PMA was a joint employer of Jones along with MTC.
 
 IV.
 
 19
 "Two or more employers may be considered `joint employers' if both employers control the terms and conditions of employment of the employee. Swallows [v. Barnes & Noble Book Stores, Inc.], 128 F.3d [990,] 993 n. 4 [(6th Cir.1997)] (citing NLRB v. Browning-Ferris Indus. of Pa., 691 F.2d 1117, 1123 (3d. Cir.1982))." Wynn v. Nat'l Broad. Co., 234 F.Supp.2d 1067, 1093 (C.D.Cal.2002).
 
 A.
 
 20
 In determining joint employment, various factors have been suggested in the collective experience of the judiciary and governmental agencies. It is a rather elaborate collection and we choose to set forth these lists here with the caveat that they have been suggested for specific fact situations, certain of which are not present or relevant here.
 
 
 21
 The most elaborate listing emanates from a case in which we had to decide whether a grower and a labor contractor were joint employers of migrant farm workers:
 
 
 22
 The Labor Department's regulations implementing the Migrant and Seasonal Agricultural Workers Protection Act (AWPA) list five factors to consider in determining whether an entity or person is a joint employer:
 
 
 23
 (A) The nature and degree of control of the workers;
 
 
 24
 (B) The degree of supervision, direct or indirect, of the work;
 
 
 25
 (C) The power to determine the pay rates or the methods of payment of the workers;
 
 
 26
 (D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; [and]
 
 
 27
 (E) Preparation of payroll and payment of wages.
 
 
 28
 29 C.F.R. § 500.20(h)(4)(ii).
 
 
 29
 The AWPA regulations make clear that this list is not exhaustive. See id. (instructing that the five regulatory factors provide guidance, but the factors to be considered in deciding whether a joint employment relationship exists are not limited to the five regulatory factors).
 
 
 30
 To determine whether a joint employment relationship exists, this court has applied an "economic reality" test. Bonnette v. California Health and Welfare Agency, 704 F.2d 1465 (9th Cir.1983). In evaluating the economic realities of a given relationship, a court should consider all factors relevant to the particular situation. Id. Thus, courts look not only to factors provided in the regulations, but also to the following factors developed through case law:
 
 
 31
 (1) The degree of the alleged employer's right to control the manner in which the work is to be performed;
 
 
 32
 (2) The alleged employee's opportunity for profit or loss depending upon the alleged employee's managerial skill;
 
 
 33
 (3) The alleged employee's investment in equipment or materials required for the alleged employee's task, or the employee's employment of helpers;
 
 
 34
 (4) Whether the service rendered requires a special skill;
 
 
 35
 (5) The degree of permanence of the working relationship;
 
 
 36
 (6) Whether the service rendered is an integral part of the alleged employer's business;
 
 
 37
 (7) Ownership of property or facilities where work occurred; and
 
 
 38
 (8) Whether responsibility under the contracts between a labor contractor and an employer passes from one labor contractor to another without material changes.
 
 
 39
 See Real v. Driscoll Strawberry Assoc., Inc., 603 F.2d 748, 754 (9th Cir.1979) (naming the first six non-regulatory factors); Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (discussing the latter two factors).
 
 
 40
 Torres-Lopez v. May, 111 F.3d 633, 646 (9th Cir.1997) (Aldisert, J., dissenting).
 
 
 41
 In deciding whether director-shareholder physicians would be counted as employees in determining if a professional corporation was covered by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., the Supreme Court referred to EEOC Compliance Manual § 605:0009, setting forth a number of its guidelines and asserting that they need not necessarily be treated as exhaustive. Clackamas Gastroenterology Assocs. v. Wells, 538 U.S. 440, 123 S.Ct. 1673, 1680 n. 10, 155 L.Ed.2d 615 (2003). Six factors are relevant to the inquiry into whether a shareholder-director is an employee for purposes of federal antidiscrimination statutes:[3]
 
 
 42
 [1] Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work
 
 
 43
 [2] Whether and, if so, to what extent the organization supervises the individual's work
 
 
 44
 [3] Whether the individual reports to someone higher in the organization
 
 
 45
 [4] Whether and, if so, to what extent the individual is able to influence the organization
 
 
 46
 [5] Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts
 
 
 47
 [6] Whether the individual shares in the profits, losses, and liabilities of the organization.
 
 
 48
 Id. at 1680 (quoting EEOC Compliance Manual § 605:0009).
 
 
 49
 In summarizing the factors, the Court synthesized what it means to be an employer:
 
 
 50
 As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed.
 
 
 51
 
 Id.
 
 
 
 52
 In the context of considering whether a company that operated a refuse transfer site was a joint employer, within the meaning of the National Labor Relations Act, 29 U.S.C. § 151 et seq., of "brokers" who furnished trucks and drivers to haul the company's trailers to a landfill, the Court of Appeals for the Third Circuit explained:
 
 
 53
 In "joint employer" situations no finding of a lack of arm's length transaction or unity of control or ownership is required, as in "single employer" cases. As this Circuit has maintained since 1942, "[i]t is rather a matter of determining which of two, or whether both, respondents control, in the capacity of employer, the labor relations of a given group of workers." NLRB v. Condenser Corp. of America, ... 128 F.2d [67,] 72 [(3d Cir.1942)] (citations omitted). The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Walter B. Cooke, 262 NLRB No. 74 (1982) (slip op. at 31). Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment. C.R. Adams Trucking, Inc., 262 NLRB No. 67 (June 30, 1982) (slip op. at 5); Ref-Chem Co. v. NLRB, 418 F.2d 127, 129 (5th Cir.1969); NLRB v. Greyhound Corp., 368 F.2d 778, 780 (5th Cir.1966).
 
 
 54
 NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F.2d 1117, 1122-1123 (3d Cir. 1982).
 
 B.
 
 55
 Anderson did not reach the question of joint employment, and the record there differed from the one developed in this case. Nevertheless, the record here supports the same findings with regard to the lack of control that PMA exercises over its member-companies such as MTC:
 
 
 56
 It does not supervise the longshoremen. It has no power to hire or fire longshoremen. It has no power to discipline longshoremen. It does not supervise the work sites of its member-employers. It is undisputed that the monitoring and control over those sites, as well as the control of the employees, is within the sole province of the member-employers.
 
 
 57
 336 F.3d at 927 (emphasis in original) (footnote omitted).
 
 
 58
 Added to the foregoing is that PMA does not own MTC. Instead, MTC is an independent company that manages its own business enterprise. The Supreme Court seems to suggest that the sine qua non of determining whether one is an employer is that an "employer can hire and fire employees, can assign tasks to employees and supervise their performance." Clackamas, 538 U.S. at ___, 123 S.Ct. at 1680. Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree. Numerous courts have considered the key to joint employment to be the right to hire, supervise and fire employees. See Bristol v. Bd. of County Comm'rs, 312 F.3d 1213, 1219 (10th Cir.2002) (en banc); Graves v. Lowery, 117 F.3d 723, 727-728 (3d Cir.1997); Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1361 (11th Cir. 1994); Rivas v. Federacion de Asociaciones Pecuarias, 929 F.2d 814, 820-821 (1st Cir.1991). These circumstances are not present here. Accordingly, we conclude that PMA was not a joint employer of Jones.
 
 
 59
 * * * *
 
 
 60
 For the foregoing reasons we conclude that there was no legally sufficient basis for the jury to find a connection with an employment relationship between PMA and Jones. Accordingly, the district court erred when it denied PMA's motion for judgment as a matter of law.
 
 
 61
 REVERSED.
 
 
 
 Notes:
 
 
 *
 The Honorable Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 PMA also argued that the district court erred in denying PMA's motion for judgment as a matter of law because Jones's sexual harassment claims were (a) barred by the 300-day statute of limitations in Title VII; and (b) precluded by the prompt remedial action taken by PMA, MTC and ILWU Local 8. PMA further argued that the district court erred in denying PMA's motion for a new trial based on the contention that the district judge improperly directed a verdict for Jones on her retaliation claim. PMA then argued that the district court erred in its post-verdict judgment in favor of Jones because the court (a) refused to reduce the jury's award of ostensibly duplicative economic damages; and (b) capped Jones's compensatory damages at $300,000 rather than $100,000. Finally, PMA argued that the district court erred in denying PMA's motion for relief from judgment, which contended that PMA was entitled to an offset in damages equal to the amount paid in settlement by MTC and one of Jones's co-workers
 
 
 [2]
 The Labor Relations Committee investigating a grievance filed on behalf of Jones summarized conditions at MTC:
 Broad testimony from Marine Terminal Corporation (MTC) employees, supervision and others indicates that a male dominated environment has been allowed to foster [sic], particularly in and around the locker[,] lunchroom and rest room/shower room. Pornography is common and tolerated by MTC management. The only proviso by management relative to the pornography is that it be stored in the individual's locker when not being reviewed. Pornographic drawings have been pinned and continue to be pinned on restroom walls, urinals, and lunchroom walls. Aggressive routines, described as practical jokes, are common and tolerated by supervision. In short, an atmosphere ... conducive with stereotypical male culture dominates the work environment.
 SER at 263.
 
 
 [3]
 The EEOC manual "states that it applies across the board to other federal antidiscrimination statutes."Clackamas, 538 U.S. at ___ n. 7, 123 S.Ct. at 1679 n. 7. In addition to the ADA, the guidelines apply to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 and the Equal Pay Act of 1963. Id.